KLAMATH STRATEGIC INVESTMENT FUND, LLC, by and through ST. Croix Ventures, LLC, Plaintiff,

v.

UNITED STATES of America, Defendant.

Civil Action Nos. 5:04–CV–278 (TJW), 5:04–CV–279.

United States District Court, E.D. Texas, Texarkana Division.

July 20, 2006.

Kent L. Jones, N. Jerold Cohen, Sheldon M. Kay, Thomas A. Cullinan, Kristin Balding Gutting, Sutherland, Asbill & Brennan, Atlanta, GA, for Plaintiff.

Andrew L. Sobotka, U.S. Attorney Office, Dallas, TX, Jennifer Kirkpatrick Brown, U.S. Dept of Justice, Washington, DC, for Defendant.

## MEMORANDUM OPINION AND ORDER

WARD, District Judge.

Before the Court is Plaintiffs' Partial Motion for Summary Judgment (# 71) and the Defendant's Cross Motion for Summary Judgment (# 79). The Court has carefully considered the parties' written submissions in reaching its decision as set forth herein.

## I. Introduction

Klamath Strategic Investment Fund, LLC ("Klamath") and Kinabalu Strategic Investment Fund, LLC ("Kinabalu") (collectively "Plaintiffs") move for summary judgment on legal issues presented in this case. These include, *inter alia*, whether: (1) the premium loans at issue are contingent obligations and "liabilities" under Section 752 of the Internal Revenue Code (the "Code"); and (2) Treasury Regulation § 1.752 (the "Regulation") is invalid.[1] The Court addresses each in turn.

This case is a civil action by the Plaintiffs against the United States under 26 U.S.C. § 6226 for readjustment of partnership items. Actions under section 6226 are similar to suits for refund where the court makes a *de novo* determination of the facts and law as they relate to the taxpayers' activities.

---

1. The other issues in Plaintiffs' Motion were not raised in the government's cross motion. Moreover, the record indicates that the parties agree that there are fact issues regarding the "economic substance" of the transaction. Accordingly, Plaintiffs' Motion regarding whether the note in question is a Convertible Payment Debt Instrument and whether Treasury Regulation § 1.701–2 is invalid is carried with the case.

This case began because the government issued Notices of Final Partnership Administrative Adjustments ("FPAAs") against the Plaintiffs for deficiencies in their tax returns. The Internal Revenue Service (the "Service" or the "IRS") issued the FPAAs to Plaintiffs on July 19, 2004, making adjustments to how Plaintiffs and their partners reported various items for tax purposes on the Forms 1065 U.S. Partnership Return of Income for their short taxable year that ended June 12, 2000. The major issue raised in the FPAAs is whether the loan premiums that Plaintiffs received from a bank in connection with the funding of their investments are to be treated as "liabilities" for purposes of calculating the bases in the partnerships under Section 752 of the Code.[2] The FPAAs assert that, under Section 752 and other recently adopted Treasury regulations, the amount of the loan premiums should be treated as liabilities.

Plaintiffs' Motion is primarily focused on the applicability and efficacy of Section 752 and a recently adopted regulation. Specifically, Plaintiffs contend that some of the legal theories of liability raised by the government in the FPAAs are invalid as a matter of law.

## II. Factual Background

St. Croix Ventures LLC ("St.Croix") and Rogue Ventures LLC ("Rogue") were formed as single-member Delaware limited liability companies on January 20, 2000. On March 29, 2000, St. Croix and Rogue each borrowed $41,700,000 from National Westminster Bank plc ("NatWest") pursuant to the terms of a Credit Agreement dated March 28, 2000 (hereinafter the "loan" or "loans"). Each of the loans had a term of seven years and a fixed interest rate. Only interest was payable until maturity. In practical terms, the loans thus required interest only payments and with a large balloon payment of the principal at the end of the term. The Credit Agreement provided St. Croix and Rogue the opportunity to prepay the loan at any time with five days notice to NatWest.

According to the express terms of the Credit Agreement, St. Croix and Rogue each opted to pay an increased interest rate on their loans in return for NatWest paying St. Croix and Rogue premiums on the date that their loans originated of $25,000,000. Thus, St. Croix and Rogue each received a "loan premium" of $25,000,000 for agreeing to pay a higher than market rate of interest (17.97 percent per annum) on the principal amount of the loans ($41,700,000). It is undisputed that the total amount received by each of St. Croix and Rogue on the date that the Credit Agreements were funded was $66,700,000. The entire $66,700,000 funded to each of St. Croix and Rogue was transferred to their respective accounts at NatWest, along with an additional cash contribution of $1,500,000 from each, with accrued interest. NatWest paid St. Croix and Rogue interest on the $66,700,000 while such amount was held in their accounts at that bank.

The Credit Agreements and two related agreements that were exhibits thereto (the Pledge and Security Agreement and the Security Deed) allowed St. Croix and Rogue (and later Klamath and Kinabalu) to use the $66,700,000 to engage in the following types of investments:

(a) any of the following: (i) time deposits of NatWest (or any of its Affiliates) with maturities of 90 days or less denominated in dollars or euros and (ii) commercial paper denominated in Dollars, Euros, or Sterling

**2.** Unless otherwise stated, all references to "Section" are to sections of the Internal Revenue Code of 1986, as amended.

and issued by NatWest, Ulster Bank Limited or Coutts & Co.,

(b) fixed income securities purchased with remaining maturities of 90 days or less issued by any governmental or corporate issuer, the outstanding long or short term unsecured debt of which is rated in one of the two highest rating categories by an internationally recognized statistical rating organization, if such fixed income securities are (i) denominated in Dollars or (ii) denominated in Euros (or in the currency of any of the United Kingdom of Great Britain and Northern Ireland, the Federal Republic of Germany, the Republic of France, Japan, Canada, and Italy),

(c) any (i) interest rate swap transactions and (ii) interest rate options that are entered into with NatWest (or any Affiliates) as the counterparty requiring settlement not later than the Maturity Date, and

(d) foreign currency spot, forward or option transactions entered into with NatWest (or any of its Affiliates) as the counterparty requiring settlement in not more than six months for Dollars and Euros with respect to (i) the currencies listed in clause (b)(ii) above, and (ii) the following additional currencies: Hong Kong dollar, Argentine Peso, Egyptian dollar, Saudi Riyal and Danish Kroner.

NatWest agreed to limit its recourse for any default under the Credit Agreement to any cash and investments in St. Croix's and Rogue's accounts at that bank. The loans were thus nonrecourse to St. Croix and Rogue.

To protect NatWest against the possibility that St. Croix or Rogue might opt to repay the loans early and that NatWest therefore would not obtain the full benefit of the increased interest rate over the full seven-year loan term, the Credit Agreements provided for a Prepayment Amount (as well as a small breakage fee) if the loans were paid off early:

> The obligation of the Borrower to pay the principal of and interest on the Stated Principal Amount, together with, if the Note is prepaid prior to the Maturity Date, the Prepayment Amount, if any, and the Breakage Fee, if any, shall be evidenced by the Note.

*See* Credit Agreements at Section 2.02(a).

The Prepayment Amount was to be calculated under a formula that took into account the Stated Principal Amount (i.e., $41,700,000), a discount factor for the maturity date based on a current bank interest rate determined at the time of prepayment, and the discounted value of the remaining interest payments that would otherwise have been due under the loan, also using a current bank interest rate determined at the time of prepayment. *See* Credit Agreements at Section 3.02. The Prepayment Amount on the day that the loan was made approximated the amount of the loan premium (i.e., $25,000,000) and declined over the term of the loan, depending on the date of future payment. *Id.* If the loan fully matured (i.e., went to 7 years) before payment occurred, no Prepayment Amount would apply. *Id.*

On April 6, 2000, St. Croix and Rogue each invested the proceeds of the loans and loan premiums along with an additional $1,500,000 in cash (i.e., for a total of $68,200,000, plus some accumulated interest), in Klamath and Kinabalu, respectively, in exchange for a 90% partnership interest.[3] NatWest agreed to allow Klamath

---

3. The other partners in Klamath and Kinaba- lu were Presidio Growth LLC and Presidio

and Kinabalu to assume, respectively, St. Croix's and Rogue's responsibilities under the Credit Agreements pursuant to Assignment and Assumption Agreements.

Ostensibly to mitigate their risk position with respect to interest rate changes during the term of the loans, on April 6, 2000, Klamath and Kinabalu each entered into a fixed-for-floating rate interest rate swap with NatWest for a term of approximately seven years. The transaction was made effective as of March 29, 2000. The Swap Agreement included a requirement for a Final Fixed Payment of $25,000,000.

Plaintiffs contend that they were formed to invest in U.S. Dollar and foreign currency denominated debt securities of corporate and governmental issuers and enter into forward currency contracts, options on currencies and securities and other investments. The overall investment strategy was described to St. Croix and Rogue in a Confidential Offering Memorandum as follows:

> Investment Strategy. The Managing Member has structured a three stage, seven year investment program which seeks to exploit trading opportunities in the markets for foreign debt securities and currencies. The core investment strategy underlying all three stages will be to maintain long or short positions in debt securities and currency exchange contracts. Through such investments, each Fund seeks to profit from changes that the Managing Member anticipates will occur in the value of the currencies in which such securities are denominated or quoted or to which the forward currency exchange contracts relate.
>
> As described under "Investment Strategy," the three stages are differentiated by the degree of risk assumed by a Fund. In each successive stage, the Managing Member will allocate a greater percentage of the Fund's assets to securities and currency positions which, in the view of the Managing Member, entail a greater opportunity for profit but also correspondingly greater risk. Reflecting the greater degree of risk, the Managing Member may require the Members to make additional capital contributions. However, the aggregate contributions of a Member will not exceed the amount to which such Member agrees at the time of subscription. The obligation to make additional capital contributions will terminate if the Member notifies the Managing Member of its election to withdraw its entire capital account balance. It is the Managing Member's belief that successful implementation of its investment strategy can best be achieved through a relatively long-term investment horizon.
>
> The Managing Member is not limited in the investment strategies that it may employ on behalf of the Funds. Among other strategies, a Fund may seek to exploit instability of emerging market currencies which have been tied or "pegged" to the currencies of major developed countries. The Managing Member believes that a currency peg sets an artificial price for the currency that is ultimately unsustainable. Free market forces work to weaken the peg. When the peg finally breaks, devaluation of the currency historically has been swift and dramatic. By monitoring the economic conditions in emerging market countries and the direction of the currency markets, the Managing Member seeks to identify, and profit from, those currency devaluations which are most likely to occur over the life of the Fund.

Resources LLC, which contributed $16,665 and $150,000 for the 1% and 9% interests, in Klamath and Kinabalu, respectively.

With respect to the three stages in the strategy: Stage I was expected to last 60 days, Stage II another 120 days, and Stage III approximately 6.5 years. After Stage I, St. Croix and Rogue might be required to make additional capital contributions up to $6,000,000 to fund the riskier investment strategies. However, St. Croix had the right to withdraw from the partnership after Stage I, and at 60 day intervals thereafter.

On May 25, 2000, St. Croix and Rogue elected to withdraw from the Klamath and Kinabalu partnerships effective June 5, 2000. In response, Klamath and Kinabalu distributed their respective assets on June 7, 2000, and prepaid the loan amount to NatWest on June 12, 2000. The tax accounting treatments of these transactions gave rise to this case.

The most significant issue is whether the $25,000,000 premiums that St. Croix and Rogue received from NatWest constitute "liabilities" under Section 752. Plaintiffs did not treat the premiums as "liabilities" under the theory that there was no fixed requirement to be repaid. Plaintiffs contend that the only thing that St. Croix and Rogue were obligated to repay were the $41,700,000 loans at a higher than market rate of interest. In addition, although St. Croix and Rogue could be obligated to pay the bank a "Prepayment Amount," that obligation would arise only if the Plaintiffs decided to repay the loans before the end of the seven year term of the Credit Agreement. As a result, Plaintiffs argue that the Prepayment Amount was not a "liability" under Section 752 because any such repayment was contingent both in the

sense that it might never be paid (i.e., if the loans went to term) and because the amount of any such repayment could not be quantified unless and until the decision was made to prepay the loans.

In response, the government asserts in this case that the $25,000,000 was a "liability." Specifically, the government argues that St. Croix and Rogue were obligated to repay the $25,000,000 premiums on the theory that repayment of the $41,700,000 loans at an increased interest rate in exchange for a $25,000,000 premium is the economic equivalent of repaying a greater loan of $66,700,000 at a lesser interest rate and with no loan premium.

Plaintiffs assert that the scenario offered by the government is not economically equivalent and that there were valid business reasons for the structure chosen by St. Croix and Rogue. In any event, even if the two structures are economically equivalent, Plaintiffs contend that taxpayers are entitled to structure their transactions in any lawful manner they choose to produce the least tax.[4]

### III. Section 752 "Liabilities"

The principal issue in this case is whether Plaintiffs were correct in taking the position that the loan premium (or the Prepayment Amount) was not a fixed and determined "liability" for purposes of Section 752. Plaintiffs contend that they did not treat the premium amount as a liability because they were not necessarily obligated to repay it. The Government asserts that the loan premium is a liability under Section 752.

---

4. *See, e.g., Compaq Computer Corp. v. Comm'r,* 277 F.3d 778, 786 (5th Cir.2001); *Carrington v. Comm'r,* 476 F.2d 704, 706 (5th Cir.1973) ("It is, of course, elementary that Carrington had the legal right to decrease the amount of what otherwise would be his taxes, or altogether avoid them, by means which the law permits. Thus the mere fact that the transac- tions here questioned were concededly designed to limit Carrington's tax liability establishes nothing with regard to the question of the proper taxation of these transactions.") (internal citations, quotations and alterations omitted); *Rhodes v. United States,* 464 F.2d 1307, 1312 (5th Cir.1972).

Section 752 governs the treatment of liabilities by partners and partnerships. It provides:

(a) Increase in partner's liabilities—Any increase in a partner's share of the liabilities of a partnership, or any increase in a partner's individual liabilities by reason of the assumption by such partner of partnership liabilities, shall be considered as a contribution of money by such partner to the partnership.

(b) Decrease in partner's liabilities— Any decrease in a partner's share of the liabilities of a partnership, or any decrease in a partner's individual liabilities by reason of the assumption by the partnership of such individual liabilities, shall be considered as a distribution of money to the partner by the partnership.

(c) Liability to which property is subject—For purposes of this section, a liability to which property is subject shall, to the extent of the fair market value of such property, be considered as a liability of the owner of the property.

(d) Sale or exchange of an interest—In the case of a sale or exchange of an interest in a partnership, liabilities shall be treated in the same manner as liabilities in connection with the sale or exchange of property not associated with partnerships.

Under Section 752(b), a partner must decrease his basis in the partnership to the extent that the partnership assumes the partner's individual "liabilities." In turn, under Section 752(a), all partners are then to increase their bases in their partnership interests for their share of the new "partnership" liability. To illustrate:

If a partner contributes property in which he has a cost basis of $100 in exchange for a 50% interest in the partnership, he has a basis of $100 in his 50% partnership interest. If, however, the contributed property was encumbered by a liability of $80, the partner's basis in the partnership will instead be $60. The basis is calculated as follows: $100 basis for the cost of the contributed property, less $80 for the liability assumed by the partnership, plus $40 for his 50% share of what is now a partnership liability.

In 1975, the Service won a case in the United States Tax Court that defined "liability" under Section 752. *Helmer v. Commissioner* involved two partners in a partnership that sold an option to acquire property owned by the partnership to a development corporation. *Helmer v. Comm'r,* 34 T.C.M. (CCH) 727 (1975). The development corporation paid up-front consideration for the option and also made annual payments that were to be applied to the purchase price of the property if the option were exercised. The partnership treated these payments as "liabilities" that had the effect of increasing each partner's basis in his partnership interests under Section 752(a) and 722. The theory was that the partnership would have to credit these payments against the purchase price if the development corporation decided to exercise the option. The Service, however, argued that the amount the partnership received for selling the option was not a liability within the meaning of Section 752. The resolution of this issue was important to the partners because the partnership distributed the option proceeds to the Helmers and, under Section 731(a), the partner would have taxable gain to the extent the distributions exceeded their partnership bases. Stated differently, each partner wanted to treat the option payments as "liabilities" to increase his basis. The Court adopted the Service's view that the option proceeds were not a liability for purposes of Section 752 because the obligation of the partnership to credit the payments to the development corporation

was contingent upon the option being exercised. The Helmers were therefore not allowed to increase their basis in the partnership and, as a result, they owed taxes on the gain from the distribution.

Not long thereafter, the Service again asserted in a Court that contingent obligations were not liabilities within the meaning of Section 752. *See Long v. Comm'r,* 71 T.C. 1, 1978 WL 3318 (1978), *motion for reconsideration,* 71 T.C. 724, 1979 WL 3765 (1979), *aff'd and remanded,* 660 F.2d 416 (10th Cir.1981). In *Long,* the court held that contingent or contested obligations were not liabilities for purposes of increasing partnership basis until the obligations became fixed or liquidated. The taxpayer in *Long* was the beneficiary of the estate of his deceased father. The decedent was a partner in a partnership that constructed buildings and, upon his death, the estate took his place as a partner in the partnership. Two lawsuits, which sought millions of dollars in damages for reconstruction-related claims, were pending against the partnership when the father died. Shortly thereafter, the partnership was liquidated and the taxpayer, as beneficiary of the estate, sought to claim a loss on the liquidation. The estate treated the construction related claims against the partnership as "liabilities" for purposes of Section 752, which would have increased its basis in the partnership and allowed it to deduct the losses. But the Service refused to allow the taxpayer to include the estate's share of such "liabilities" in its outside basis because the claims against the estate were contingent. The court agreed:

> Although they may be considered "liabilities" in the generic sense of the term, contingent or contested liabilities such as the Kansas City Life–TWA and USF & G claims are not "liabilities" for partnership basis purposes at least until they become fixed or liquidated. This Court has held on a number of occasions

that contingent and indefinite liabilities assumed by the purchaser of an asset are not part of the cost basis of the asset. We think that partnership liabilities should be treated in the same manner. We see no logical reason for distinguishing the above cases solely because the asset involved is an interest in a partnership, and neither party suggests such a distinction. Those liabilities should be taken into account only when they are fixed or paid.

71 T.C. at 7–8 (citations omitted). Thus, *Long* held there were two reasons that the claims were not liabilities under Section 752: the obligations were contingent and they were indefinite in amount.

In *La Rue v. Comm'r,* 90 T.C. 465, 1988 WL 23562 (1988), the Service again argued, and the Court agreed, that obligations that are fixed in the sense that it is known that some amount will be paid, but that remain contingent in amount, do not constitute "liabilities" for purposes of Section 752. The *La Rue* Court held that even though a contractual obligation is fixed, that obligation does not represent a liability under Section 752 until the cost of that obligation becomes fixed in amount. *Id.* at 479, 1988 WL 23562; *see also Long,* 71 T.C. at 8.

The Fifth Circuit has also addressed this issue. In *Gibson Prods. Co. v. United States,* a taxpayer invested in an oil drilling partnership. 637 F.2d 1041 (5th Cir. 1981). The partnership then entered into a series of leases and turnkey drilling contracts with a third-party, for which the partnership paid $440,000 in cash and gave a $660,000 promissory note. The Fifth Circuit determined that the liability of the partnership was contingent on oil and gas production from the leases and contracts. At issue was whether the partner could treat its proportionate share of the $660,000 note as a "liability" under Section

752. The Fifth Circuit ruled in favor of the Service and found that the contingent nature of the obligation precluded treatment as a liability for tax purposes.[5] The cases therefore adopt the Service's consistent view that contingent or nonexecutory obligations are not liabilities under Section 752.[6]

## IV. Analysis Regarding Section 752

### A. *Neither the Loan Premium nor the Prepayment Amounts are Liabilities Under Section 752*

■ Plaintiffs contend that neither the loan premium nor the Prepayment Amount are liabilities under Section 752. They contend that they relied on the Service's interpretation of Section 752 in *Helmer, Long, La Rue* and *Gibson* (hereinafter the "752 Cases"). First, Plaintiffs contend that the loan premium is not a liability because there was no obligation to repay the premium. Instead, the Plaintiffs were obligated to repay a loan of $41,700,000 at a higher than market interest rate. Second, Plaintiffs argue that the Prepayment Amount is contingent because it will never be paid if the loan goes to term. Finally, the Plaintiffs argue that the Prepayment Amount is based on an interest rate that cannot be known until the decision to prepay the loan is made.

Plaintiffs are correct. Under the language of the Credit Agreement, there were no circumstances under which the Plaintiffs were obligated to repay the loan premium. Rather, the only potential obligation was to pay the Prepayment Amount—not the loan premium—if the taxpayers decided to prepay the loan. The Prepayment Amount, however, was contingent because Plaintiffs were required to make the payment *only if* Plaintiffs decided to prepay the loan. Further, the amount of any such payment was not fixed and determined but instead changed daily over the seven-year term of the loan as a function of a myriad of variables. As a contingent obligation, neither the potential Prepayment Amount nor the loan premium would constitute a liability under the 752 Cases.

The government asserts that the 752 Cases are not on point. Specifically, the government contends that these cases are factually distinguishable because all of those cases rely on situations wherein a taxpayer wanted to increase basis in the amount of a potential partnership liability that might never actually be incurred. In those cases, the government sought to prevent taxpayers from increasing their basis under Section 752(a) in the amount of a partnership liability that might never be paid. If the partners in those cases were allowed such an increase under Section 752(a), that increase would represent an economic windfall, unless and until the liability was actually incurred. The government contends that this case involves a taxpayer that contributes an existing liability to a partnership, but wishes to avoid

---

5. Further, the Service has applied the reasoning of the aforementioned cases in its revenue rulings. *See, e.g.*, Rev. Rul. 79–294, 1979–2 C.B. 305 (in computing costs basis, obligations reflected in executory contracts prior to performance of the contract is not included in the basis); *see also* 73–301, 1973–2 C.B. 215 (holding that interim payments in connection with a long-term contract were not liabilities under Section 752); 57–29, 1957–1 C.B. 519 (in computing costs basis, the Service does not recognize obligations reflected in executory contracts prior to performance); I.R.S. G.C.M. 37971 (June 1, 1979) (same); I.R.S. G.C.M. 37860 (Feb. 16, 1979) (same).

6. The case law was particularly important for this term as the government admits that until June 24, 2003, there had been no definition of "liability" outside of case law. *See* Assumption of Partner Liabilities, 68 Fed.Reg. 37434 (June 24, 2003) ("There is no statutory or regulatory definition of liabilities for purposes of Section 752.").

having to decrease his basis under Section 752(b) by the full amount of liability assumed. The Court is not persuaded.

The government's proposed distinctions are not borne out by the cases. In *La Rue*, for example, the Tax Court specifically found that the taxpayer was obligated to make payment. *See La Rue v. Comm'r*, 90 T.C. 465, 479, 1988 WL 23562 (1988). Moreover, the taxpayer had established reserves to pay this obligation, and such reserves are the functional equivalent of the collateral account here. Nevertheless, the Tax Court found the existing obligation was not a liability under Section 752 because it was still "contingent in amount." *Id.* at 479, 1988 WL 23562.

The government asserts that the material question is whether the Plaintiffs had to repay the full $66,700,000. Specifically, the government views the obligations from an aggregate perspective and asserts that the Plaintiffs always had to repay at least the same minimum amount of money they received from the bank—$66,700,000. The government contends that this accurately reflects the amount of Plaintiffs' liability regardless of whether it is viewed as a $66,700,00 loan; a $41,700,000 loan with a $25,000,000 Premium; or a $41,700,000 loan and a Prepayment Amount.

The government is wrong. The Credit Agreement and supporting documents reflect that the only obligations undertaken by St. Croix and Rogue were to repay the $41,700,000 loans over a seven-year term at the increased interest rate or, if they decided to prepay the loans, to pay a Prepayment Amount. Plaintiffs dispute the government's contention that a $41,700,000 loan carrying a 17.97% interest rate with a $25,000,000 premium is the equivalent of a $66,700,000 loan carrying a 7% interest rate. In any event, because Plaintiffs had

the "option" to prepay the loan, they could escape paying the 17.97% interest for seven years.

Plaintiffs also dispute that the hypothetical "unamortized premium" amount as calculated by the government's experts would be the same as the Prepayment Amount, if any, because under the government's theory, the hypothetical "unamortized premium" amount would be calculated from the outset using a fixed rate of interest, while the Prepayment Amount is calculated using interest rates in effect when the decision to prepay the loan is made, which could make the Prepayment Amount significantly more or less than the hypothetical "unamortized premium." While the government is correct that, over the short term, the Prepayment Amount is nearly $25,000,000, that is not determinative.[7] As the Prepayment Amount varies with interest, the amount cannot be determined until prepayment is made. There can be no question that, if the Plaintiffs had waited two years to prepay the loan, the amount would be far different than the loan premium amortized over seven years.

The government's attempt to lump all the money together in one pot ignores the plain terms of the Credit Agreement and the Court rejects that argument. Further, as will be seen *infra*, the promulgation of *Notice 2000–44* and the Regulation provide further evidence that the government was well aware that the loan premium and Prepayment Amounts would not be liabilities under Section 752 and the 752 Cases.

B. *The Government's Argument Regarding Inside/Outside Basis is Inapplicable.*

The government also contends that the loan premium or Prepayment Amounts must be liabilities under Section 752 in order to prevent a disparity between what

7. That fact would be more relevant to whether the transaction was a sham or lacked economic substance—issues the government properly asserts are for trial.

is known as inside and outside basis. Generally, under Section 722, when a partner contributes property to a partnership in return for a partnership interest, the contributing partner assumes a tax basis in his partnership interest equal to his tax basis in the property he contributed, plus the amount of any cash he contributed to the partnership. The partner's tax basis in his partnership interest is commonly referred to as "outside basis." This is in contrast to the partnership's basis in the assets it received from the partner, which is referred to as "inside basis."

The government contends that the Section 752 allocation of partnership liabilities among partners serves to equalize the partnership's basis in its assets (inside basis) with the partner's basis in their partnership interests (outside basis). The Tax Court also recognizes this general rule. *See Salina Partnership L.P. v. Commissioner,* T.C. Memo.2000–352, 80 T.C.M. (CCH) at 698.

In this case, Plaintiffs' position necessitates that the premiums that are not liabilities under Section 752 would create a disparity between the partners' combined outside basis and the partnership's inside basis of $25,000,000. The government contends that this disparity results in a $25,000,000 windfall in artificial tax basis from loan proceeds that were never taxed as income upon their receipt.

The government's argument regarding the mismatch between inside and outside basis is unavailing. The positions the government took in the 752 Cases resulted in the same disparity between inside and outside basis that it protests will occur here under Plaintiffs' position. *See, e.g., Helmer v. Comm'r,* 34 T.C.M. (CCH) 727 (1975). The only difference between the 752 Cases regarding liability and this case

is that the taxpayer is receiving the benefit rather than the IRS.

It is clear from the record that the government has often and consistently relied on the principle that a "liability" under Section 752 does not include an obligation that is contingent. The government has applied this principle when it works to its benefit (to increase taxes owed). This Court will consistently apply these same principles even if they sometimes work to the benefit of taxpayers (to decrease taxes owed). This Court's analysis of "liability" under Section 752 will not vary in meaning simply based on whose ox is being gored.

## V. Issuance of Treasury Regulation § 1.752

### A. The Law Changes for "Liabilities" Under Section 752

On June 24, 2003, the Treasury Department revised the regulations that govern the definition of a "liability" for purposes of Section 752. The new regulations under Section 752 expanded the definition of liability to include "any fixed or contingent obligation to make payment without regard to whether the obligation is otherwise taken into account for purposes of the Internal Revenue Code." Treas. Reg. § 1.752–1(a)(4)(ii); *see also* Treas. Reg. § 1.752–6(a); Treas. Reg. § 1.752–7(b)(3).

The Treasury Department decided to make this new regulation retroactive. *See* Treas. Reg. § 1.752–6 (the "Regulation"). The Regulation purports to apply to all assumptions of "liabilities" (as newly defined) by partnerships occurring after October 18, 1999, and before June 24, 2003 (i.e., the Regulation applies only to assumptions of "liabilities" by partnerships that took place before the Regulation was promulgated).[8]

---

**8.** The Treasury issued a different regulation for "liabilities" after the effective date of the

Regulation.

The Regulation requires a partner to reduce his basis in his partnership interest by the amount of any contingent obligation assumed by the partnership between October 18, 1999, and June 24, 2003, but would not allow the partner to increase his basis for the share of the new partnership liability. This would, of course, require a major adjustment to the tax positions taken by the Plaintiffs in this case.[9]

There is no doubt that the government knew it was changing the law regarding "liabilities" under Section 752 with this new regulation. The Regulation itself indicates that it changes settled law regarding "liabilities" for Section 752:

> "The definition of a liability contained in these proposed regulations does not follow *Helmer v. Commissioner,* TC Memo 1975–160. (The Tax Court, in Helmer held that a partnership's issuance of an option to acquire property did not create a partnership liability for purposes of Section 752.)."

*See* Notice of Proposed Rulemaking, 68 Fed.Reg. 37434 (June 24, 2003).

Further, if there was not a change in the law, as the government posits, there would have been no need to promulgate the Regulation. Indeed, from this Court's view, the promulgation—and the statements made in conjunction with the promulgation—is compelling evidence that the IRS knew it was seeking to change settled law to bar, retroactively, the transactions engaged in by the Plaintiffs.

In any event, assuming the Regulation is valid and enforceable as written, summary judgment would be appropriate in favor of

the government. Application of the Regulation in this case is straightforward. Under the Regulation, the "premium" portion of the loan must be treated as a liability for purposes of the contributing partners' bases, and as a liability for purposes of the bases of the partnerships. However, before granting summary judgment in favor of the government, this Court must first determine whether the Regulation is valid and enforceable.

**B.** *The Law Regarding Retroactivity of the Regulation*

The Code generally prohibits retroactive regulations. However, Section 7805 of the Code allows the Service to promulgate regulations with retroactive effect under limited circumstances:

(b) Retroactivity of regulations.—

(1) In general.—Except as otherwise provided in this subsection, no temporary, proposed, or final regulation relating to the internal revenue laws shall apply to any taxable period ending before the earliest of the following dates:

> (A) The date on which such regulations is filed with the Federal Register.

\*　　\*　　\*　　\*　　\*　　\*

(3) Prevention of abuse.—The Secretary may provide that any regulation may take effect or apply retroactively to prevent abuse.

\*　　\*　　\*　　\*　　\*　　\*

(6) Congressional Authorization.—The limitation of paragraph (1) may be superseded by a legislative grant from

---

**9.** Under the normal rules of Section 752, a partner's basis in his partnership interest is reduced under Section 752(b) to the extent that the partnership assumes his personal "liability." Section 752(a), however, also allows the partners to increase their bases in the partnership interests by their shares of the liability that the partnership has assumed.

The Regulation has no parallel provision. When a partnership assumes a liability subject to the Regulation, the partners are therefore not allowed to increase their basis by their proportionate share of such liability. This is a major difference between the operation of the Regulation and the prior application of Section 752.

Congress authorizing the Secretary to prescribe the effective date with respect to any regulation.

The government contends that the retroactivity of the Regulation is permitted under both Section 7805(b)(3) & (6). The Court will address each in turn.

## VI. Analysis of the Regulation

### A. Standard of Review for Treasury Regulations

■ The standard of review applicable to Treasury Regulations depends on whether the regulation at issue is a "legislative regulation" or an "interpretative regulation." [10] A legislative regulation is a regulation issued under a specific grant of Congressional authority to prescribe a method of executing a statutory provision. *Snap–Drape, Inc. v. Commissioner,* 98 F.3d 194, 198 (5th Cir.1996). In contrast, an interpretive regulation is promulgated pursuant to the Treasury's general authority under I.R.C. § 7805 to prescribe regulations. *Id.* "A court must accord a higher degree of deference to a legislative regulation than to an interpretive one." *Id.*

■■ The deference accorded to a legislative regulation is so high that such regulations have controlling weight unless they are arbitrary, capricious, or manifest contrary to the underlying statute. *Chevron, U.S.A., Inc. v. Natural Resources Defense Council, Inc.,* 467 U.S. 837, 843–44, 104 S.Ct. 2778, 81 L.Ed.2d 694 (1984); *Fransen v. United States,* 191 F.3d 599, 600 (5th Cir.1999). This standard of deference is sometimes referred to as the "*Chevron* deference." *See, e.g., Belt v. EmCare, Inc.,* 444 F.3d 403, 416 n. 35 (5th Cir.2006). Thus, when reviewing a legislative regulation entitled to *Chevron* deference "a court may not substitute its own construction of a statutory provision for a reasonable interpretation made by the administrator of an agency." *Chevron* at 843–44, 104 S.Ct. 2778. Once again, however, the *Chevron* deference is only available to the Regulation if it is a legislative regulation.

### B. The Regulation is an Interpretive Regulation—Not a Legislative Regulation

■ To assess whether the Regulation is owed *Chevron* deference, the Court must determine whether the Regulation was issued pursuant to a grant of Congressional authority. The government contends that the Regulation was promulgated pursuant to § 309 of the Community Renewal Tax Relief Act. *See* Assumption of Partner Liabilities, T.D. 9207, 70 Fed. Reg. 30334, 30335. There are three parts to Section 309 which are relevant here. First, that section added Section 358(h) to the Code to combat tax results of a corporate transaction described in Notice 2001–17, which involved the acceleration and duplication of a loss relating to certain liabilities by transferring assets and those liabilities to a corporate subsidiary. Second, Section 309(c) then directed the Treasury Department to promulgate "comparable rules" for partnerships:

(c) Application of Comparable Rules to Partnerships and S Corporations.—The secretary of the Treasury or his delegate—

(1) shall prescribe rules which provide appropriate adjustments under subchapter K of chapter 1 of the Internal Revenue Code of 1986 to prevent the acceleration or duplication of losses through the assumption of (or transfer or assets subject to) liabilities described in section 358(h)(3) of such Code (as added by

---

**10.** A retroactive legislative regulation would correspond to Section 7805(b)(6). If the retroactive regulation is interpretive, it would correspond to Section 7805(b)(3).

subsection (a)) in transactions involving partnerships . . .

Finally, Section 309(d) dictated that the rules prescribed under Section 309(c) "shall apply to assumptions of liability after October 18, 1999, or such later date as may be prescribed in such rules."

In Section 309(c), Congress gave the Treasury Department authority to promulgate rules "comparable" to those contained in new Section 358(h) to provide "appropriate adjustments . . . to prevent the acceleration or duplication of losses through the assumption of (or transfer of assets subject to) liabilities described in section 358(h)(3) . . . in transactions involving partnerships". The government contends that this language authorized it to promulgate the Regulation in this case. The government is wrong.

In the first place, the Act and its legislative history do not mention Section 752. Moreover, the legislation that became Act Section 309 was proposed on October 19, 1999, well before the Service issued *Notice 2000–44* on August 11, 2000. *See* Joint Committee on Taxation, Description of Modified Chairman's Mark Relating to Expiring Tax Provisions (JCX–73–99), October 19, 1999 (describing provision to "Prevent Duplication or Acceleration of Loss Through Assumption of Certain Liabilities"). Nothing in the Act or its legislative

history suggests that Congress was even aware of the partnership transactions described in *Notice 2000–44* when the legislation that became Section 309 was proposed.

In addition, the Treasury Department in fact promulgated a rule in accordance with Section 309 when it issued Treas. Reg. § 1.358–7. This regulation, titled "Transfers by partners and partnerships to corporations," addresses contributions of assets and liabilities by partnerships to corporations in which they are shareholders. This regulation is plainly the type contemplated by the Act. The Court interprets this grant of authority by Congress to promulgate rules applicable to partnerships that were shareholders in corporations that engaged in transactions subject to Section 358(h). Thus, the Regulation exceeds the grant of Congressional authority.[11]

Even though the Regulation exceeds Congress's § 309 grant of authority, this would not, *ipso facto*, invalidate the Regulation. Instead, to the extent that Congress' grant of authority was exceeded, the Regulation should be reviewed as an "interpretive regulation" rather than a "legislative regulation." *See Snap–Drape, Inc. v. Comm'r*, 98 F.3d 194, 199 (5th Cir.1996) ("[A] regulation issued pursuant to a specific directive may nevertheless be inter-

---

**11.** While certainly not dispositive, the Court notes that when the Regulation was issued, many commentators also recognized that the Regulation exceeded the scope of Congressional authority. *See, e.g.,* Letter from the American Institute of Certified Public Accountants to Commissioner Mark Everson, *reprinted in AICPA Comments on Proposed and Temporary Regulations on Assumption of Partner Liabilities Under I.R. C. Section 752*, 83 DTR G–7 (April 30, 2004) ("[T]he AICPA is concerned that these regulations appear to exceed the underlying statutory authority."); Letter from the New York State Society of Certified Public Accountants to Mr. Horace Howells at IRS, *reprinted in CPAs Comment*

*on Proposed Definition of Partnership Liabilities*, 2003 Tax Notes Today 195–16 (Sept. 15, 2003) (noting that the Regulation cannot be reconciled with existing precedent and expressing concern about the ability of taxpayers to rely on settled law); Letter from Fred Goldberg, Jr. (former IRS Chief Counsel, Commissioner of IRS and Assistant Secretary of the Treasury for Tax Policy) to IRS, *reprinted in Goldberg Suggests Son of Boss Regs Will Diminish Settlement Prospects*, 2003 Tax Notes Today 219–47 (Nov. 13, 2003) ("[W]e believe that the IRS has significant litigation risks respecting the validity of the Temporary Regulation.").

pretive to the extent it exceeds Congress' specific grant of authority.").

C. *The Regulation is Ineffective for Conduct Occurring Before August 11, 2000.*

 The Service's decision to make a regulation retroactive is reviewed for abuse of discretion. *See Snap–Drape Inc. v. Commissioner,* 98 F.3d 194, 202 (5th Cir.1996). As the Fifth Circuit noted, "the Internal Revenue Service does not have carte blanche" authority to issue retroactive regulations. *See id.*

 The following factors are relevant considerations when reviewing the efficacy of a retroactive regulation:

(1) whether or to what extent the taxpayer justifiably relied on settled prior law or policy and whether or to what extent the putatively retroactive regulation alters that law;

(2) the extent, if any, to which the prior law or policy has been implicitly approved by Congress, as by legislative re-enactment of the pertinent Code provisions;

(3) whether retroactivity would advance or frustrate the interest in equality of treatment among similarly situated taxpayers; and

(4) whether according retroactive effect would produce an inordinately harsh result.

*Id.* (*citing Anderson, Clayton & Co. v. United States,* 562 F.2d 972, 981 (5th Cir. 1977)). This list of relevant factors is not exhaustive and is to serve as flexible guidance when evaluating a retroactive regulation. *Id.*

1. Factor 1: *Whether or to what extent the taxpayer justifiably relied on settled prior law or policy and whether or to what extent the putatively retroactive regulation alters that law.*

This case is similar to *Snap–Drape* in that Plaintiffs can demonstrate that the case law was settled as to the definition of "liability" under Section 752. *See id.* at 203. Twenty-five plus years of consistent positions by the Service provided a clear definition of "liability" under Section 752. Plaintiffs in this case could justifiably rely on this settled law—even if it might work to lower their respective tax obligations. *See, e.g., Compaq Computer Corp. v. Commissioner,* 277 F.3d 778, 786 (5th Cir. 2001); *Carrington v. Comm'r,* 476 F.2d 704, 706 (5th Cir.1973); *see also Rhodes v. United States,* 464 F.2d 1307, 1312 (5th Cir.1972). The Regulation is a clear departure from this accepted definition. Accordingly, this factor would weigh in favor of invalidating the retroactive effect of the Regulation, at least to the extent the retroactive application caused the Regulation to apply to conduct occurring prior to issuance of *Notice 2000–44.*

2. Factor 2: *The extent, if any, to which the prior law or policy has been implicitly approved by Congress, as by legislative re-enactment of the pertinent Code provisions.*

Since *Helmer,* Congress has either amended, or authorized the Treasury Department to promulgate regulations interpreting, various provisions of subchapter K of the Code. There is no evidence that Congress intended the definition of liability under Section 752 to be modified. A failure by Congress to amend Section 752 is implicit approval of the definition developed under *Helmer* and its progeny. *Dep't of Hous. and Urban Dev. v. Rucker,* 535 U.S. 125, 133 n. 4, 122 S.Ct. 1230, 152 L.Ed.2d 258 (2002). This factor would also support eliminating the retroactivity of the Regulation.

3. Factor 3: *Whether retroactivity would advance or frustrate the in-*

*terest in equality of treatment among similarly situated taxpayers.*

There is nothing to suggest unequal treatment for similarly situated taxpayers. Accordingly, this factor would not support invalidating the Regulation.

4. Factor 4: *Whether according retroactive effect would produce an inordinately harsh result.*

In many respects Factor 4 relates back to Factor 1. In this case, retroactive application will result in the assessment of millions of dollars in fees against Plaintiffs who ostensibly relied on the Section 752 cases. It is significant that Plaintiffs might have been in a position to structure their conduct differently had they been provided notice of the Service's intentions. Moreover, retroactivity also allows the issuance of punitive penalties for conduct that was, on its face, in accordance with the tax laws. *See, e.g., Compaq Computer Corp.,* 277 F.3d at 786; *Carrington,* 476 F.2d at 706; *Rhodes,* 464 F.2d at 1312. This final factor also supports limiting the retroactivity of the Regulation.

While the Court in *Snap–Drape* ultimately upheld the retroactivity of the regulation at issue in that case, this case is markedly different. In that case, the retroactivity was tied to the publishing of the proposed regulation itself. *See Snap–Drape,* 98 F.3d at 202–03. Thus, the regulation was retroactive only to the extent that it was effective back to its originally published date.[12]

In this case, the Regulation was published for the first time in June of 2003. There was no indication of the manner the Service intended to change the well-settled definition of "liability" until that time. Moreover, and even more importantly, there was no evidence that the Service even intended to alter the definition of "liabilities" under Section 752 before issuance of *Notice 2000–44.*

Consequently, the efficacy of the Regulation is inextricably intertwined with *Notice 2000–44.* On September 5, 2000, the IRS formally released *Notice 2000–44,* which describes the same tax issues regarding loan premiums that were used by the Plaintiffs in this case. In Notice 2000–44, the IRS made very clear that it would challenge this type of tax treatment. *See Tax Avoidance Using Artificially High Basis,* 2000 WL 1138430 (Aug. 13, 2000).

Nearly three years later the Treasury Department promulgated the Regulation. The government admits that the Service's intent to apply this regulation to liability assumptions occurring as part of Notice 2000–44 transactions is made explicit in the preamble to the published Regulation, which states:

> Prior to the enactment of Code section 358(h) and section 309(c) and (d)(2) of the Act, the lack of specific rules addressing the treatment of liabilities upon the transfer of property to a corporation or a partnership led to interpretations of then existing law that failed to reflect the true economics of certain transactions. In some cases, taxpayers continued to assert these interpretations even after the enactment of these statutory provisions. For example, in a transaction addressed in Notice 2000–44 (2000–2 C.B.255), a taxpayer purchases and writes economically offsetting options and then purports to create substantial positive basis by transferring those option positions to a partnership. On the disposition of the partnership interest, the liquidation of the partner's interest in the partnership, or the taxpayer's sale

---

**12.** This would also lend support to the retroactivity being modest and would also highlight how the taxpayer was on notice of the correct tax treatment. In this case, rules regarding the tax treatment itself were not promulgated until 2003.

or depreciation of distributed partnership assets, the taxpayer claims a tax loss, even though the taxpayer has incurred no corresponding economic loss.

Thus, it could not be clearer that the government provided notice as early as August of 2000 that it disagreed with the method of tax treatment used by the Plaintiffs in this case.

Thus, taxpayers who engaged in conduct similar to the Plaintiffs after August of 2000 were on notice of the Service's issue with these transactions. *See* Notice 2000–44. The question of whether those taxpayers could have justifiably relied on the definition of "liability" in the 752 Cases in the context of these transactions is not before the Court.[13]

As stated above, the Plaintiffs in this case did not have the benefit of that notice.[14] All of the conduct complained of in this litigation occurred *before* Notice 2000–44 was published or issued. Taxpayers, including the Plaintiffs, were entitled to rely on the well-established position of the Service for the past 25 years in the 752 Cases. *See Snap–Drape*, 98 F.3d at 202; *Anderson, Clayton & Co.*, 562 F.2d at 981. The decision to retroactively apply a regulatory change that is in conflict with this long line of cases without any prior notice is therefore an abuse of discretion. *See id.*

Finally, the Court cannot help but note that the Regulation applies only to conduct that occurred before June 24, 2003, and after October 18, 1999. *See* Treas. Reg. § 1.752–6(d). The Service then issued a different regulation to govern liabilities for conduct that occurred after June 24, 2003. A narrow time frame, coupled with conduct that the Service specifically calls out in the preamble of the Regulation, is a strong indication that the promulgation of the Regulation was to buttress the government litigation position in this and similar cases. *See, e.g., Bowen v. Georgetown Univ. Hosp.*, 488 U.S. 204, 213, 109 S.Ct. 468, 102 L.Ed.2d 493 (1988) ("Deference to what appears to be nothing more than an agency's convenient litigating position would be entirely inappropriate."); *see also Chock Full O'Nuts Corp. v. United States*, 453 F.2d 300, 303 (2d Cir.1971) ("[T]he Commissioner may not take advantage of his power to promulgate retroactive regulations during the course of a litigation for the purpose of providing himself with a defense based on the presumption of validity accorded to such regulation."). This issue is supportive of Plaintiffs' position that the Regulation is owed no deference and that its retroactivity is ineffective.

## VII. Conclusion

Until June of 2003, the Service had asserted through litigation that contingent obligations were not liabilities under Section 752. The courts agreed with the government for more then two decades. As there was no statutory or regulatory definition of "liability" under Section 752, the body of law represented by that line of cases provided the only definition available to taxpayers. Accordingly, taxpayers—including the Plaintiffs in this case—could

---

**13.** The Court does not take the occasion to analyze the efficacy of the Regulation after issuance of Notice 2000–44 as that issue is not before the Court. In no way does this Court intend to suggest that the Regulation is, or is not, invalid after Notice 2000–44. However, the Court believes that taxpayers who engaged in the allegedly prohibited conduct prior to issuance of Notice 2000–44 are in a different position than those that engaged in the conduct after issuance.

**14.** The government asserts that the Plaintiffs were aware of Notice 2000–44 before they filed their taxes. However, the relevant inquiry is whether the taxpayers had "notice" before engaging in the prohibited conduct. In this case, the taxpayers did not have such notice.

justifiably rely on the 752 Cases when making tax decisions.

In June of 2003, the government issued a retroactive regulation that changed the definition of liabilities to specifically include contingent obligations as well. The issuance of this regulation was due in large part to the government's attempt to curb alleged taxpayer abuse through the use of transactions similar to the ones utilized by Plaintiffs. However, taxpayers—like the Plaintiffs in this case—that engaged in the conduct before issuance of any notice could justifiably rely on *Helmer* and its progeny. Thus, the retroactivity of the Regulation is ineffective as to these Plaintiffs.